**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICK C. JARMAN,** | : | **CIVIL ACTION NO. 1:13-CV-0932** |
| | : | |
| **Plaintiff,** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAPITAL BLUE CROSS and** | : | |
| **CAPITAL ADVANTAGE INSURANCE** | : | |
| **COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

Presently before the court in the above-captioned matter is a motion (Doc. 9) to dismiss or to stay filed by Capital Blue Cross and Capital Advantage Insurance Company (collectively, "Capital" or "defendants") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The parties have fully briefed the issues and the motion is ripe for disposition. For the reasons that follow, the court will grant the motion in part, deny the motion in part, and defer the motion in part pending the results of jurisdictional discovery.

**I.   <u>Factual and Procedural History</u>**

The instant matter involves an insurance coverage dispute between plaintiff Patrick Jarman ("Jarman"), a covered dependent under a group preferred provider ("PPO") health insurance plan (the "Health Plan") issued by Capital to McNees Wallace & Nurick LLC, a law firm employing Jarman's father. (Doc. 1 at ¶ 1). The Health Plan is a fully-insured, employer-provided group health plan operating on a calendar year schedule and renewing effective January 1 of each year. (<u>Id.</u> at ¶ 12).

Jarman was a covered dependent under the PPO by virtue of his father's "family coverage" election. (Id. at ¶ 6). The dispute *sub judice* relates to certain maximum coverage limits imposed by Capital as required by state law, and Capital's denial of coverage beyond those limits, a decision which Jarman contends is a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Jarman is diagnosed with autism spectrum disorder ("ASD"). (Id. at ¶ 2). As part of his ASD treatment, Jarman receives applied behavior analysis ("ABA") services exclusively from The Vista Foundation, a Pennsylvania nonprofit entity licensed by Pennsylvania's Department of Public Welfare ("DPW"). (Id. at ¶ 19). As a partial hospitalization program, the foundation is considered an "autism service provider" as that term is defined under Pennsylvania law.  40 PA. STAT. § 764(h)(2) (defining term). The foundation is a Capital preferred provider, performing reimbursable ABA services to Health Plan members. (See Doc. 1 at ¶ 20).

Prior to January 1, 2010, Jarman's ABA services were unreimbursed by the Health Plan. (Id. at ¶ 45). Effective January 1, 2010, the Health Plan contractually agreed to reimburse The Vista Foundation for ABA services up to the $36,000 annual dollar limit established by the Pennsylvania Autism Insurance Act, 40 P.S. § 764h(b) ("Act 62"); the Health Plan denied claims for services beyond the annual limit. (Id. at ¶ 46). In 2011 and 2012, the plan reimbursed all of Jarman's claims for ABA services up to the annual limit but denied claims in excess of that amount. (Id. at ¶¶ 47-48). The Health Plan does not impose annual or lifetime dollar limits with respect to medical or surgical benefits. (Id. at ¶ 44).

Jarman appealed "certain of those 2012 denials" under an expedited internal review process provided for by Act 62. (Id. at ¶ 49). Capital failed to meet Act 62's expedited internal review deadlines and thus approved those claims appealed under the internal review process. (Id. at ¶ 50). Jarman then appealed all denied claims for services on or after September 11, 2012 (the "2012 Claims"), (id. at ¶ 51), this time waiving his Act 62 rights to expedited internal review, (id. at ¶ 52). On December 13, 2012, Capital issued a Notice of Final Adverse Determination and finalized its denial of the 2012 Claims. (Id. at ¶ 53). Therein, Capital indicated that it was aware of "federal law enacted both prior to and subsequent to Act 62 on the subject of health care benefits," but that, in its view, the law did not supersede the application of Act 62's limit to the 2012 Claims. (Id. at ¶ 54).

Jarman commenced this action by filing a complaint (Doc. 1) on April 12, 2013. Therein, Jarman asserts a claim for violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, (Count I), and for breach of contract (Count II). Jarman's claims, at their core, involve a singular question: whether the Health Plan violated ERISA by imposing an annual cap on autism services and treatment when no commensurate limitation is imposed on medical or surgical benefits. (Id.). On June 24, 2013, Capital filed the instant motion to dismiss or to stay (Doc. 9) asserting that Jarman lacks standing because he has suffered no injury-in-fact, that the court should abstain from exercising jurisdiction pursuant to Burford v. Sun Oil Co., 319 U.S. 315 (1943) or the primary jurisdiction doctrine, and that, at minimum, Jarman's breach of contract claim is preempted by ERISA and

3

subject to dismissal. The motion has been fully briefed (Docs. 10, 18, 19) and is ripe

for disposition.

## II.   <u>Standard of Review</u>

Capital moves the court to dismiss for lack of subject matter jurisdiction,

<u>see</u> FED. R. CIV. P. 12(b)(1), and for failure to state a claim upon which relief can be

granted, <u>see</u> FED. R. CIV. P. 12(b)(6).

### A.   **Rule 12(b)(1): Subject Matter Jurisdiction**

In considering a motion to dismiss under Federal Rule of Civil Procedure

Rule 12(b)(1), a court must distinguish between facial and factual challenges to its

subject matter jurisdiction. <u>See</u> <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d

884, 891 (3d Cir. 1977).  A facial attack challenges whether the plaintiff has properly

pled jurisdiction.  *Id.* In evaluating the merits of a facial attach, the court is limited

to considering the allegations in the complaint and any documents referred to

therein or attached thereto in the light most favorable to the non-moving party.

<u>Gould Elecs., Inc. v. United States</u>, 220 F.3d 169, 176 (3d Cir. 2000) (citing

<u>Mortensen</u>, 549 F.2d at 891).   A factual attack, in contrast, challenges jurisdiction

based on facts apart from the pleadings. <u>Mortensen</u>, 549 F.2d at 891.  When a

defendant challenges the fact of a court's subject matter jurisdiction, the court is

"free to weigh the evidence and satisfy itself whether it has power to hear the case."

<u>Carpet Group Int'l v. Oriental Rug Importers Ass'n</u>, 227 F.3d 62, 69 (3d Cir. 2000).

When reviewing a factual challenge, the court does not apply a presumption of

truthfulness to the plaintiff's allegations and instead must weigh the allegations of

the complaint, in addition to any "affidavits, documents, and even limited evidentiary hearings," to satisfy itself that it has jurisdiction to hear a case. Turicentro, S.A. v. American Airlines, Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002).

**B.      Rule 12(b)(6): Failure to State a Claim**

In addition to establishing jurisdiction, federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint in the face of a motion pursuant to Rule 12(b)(6), the court conducts a three-step inquiry. Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Second, the factual and legal elements of a claim are separated; well-pleaded facts must be accepted as true, while legal conclusions may be disregarded. Id.; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009). Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. When the complaint fails to present a

*prima facie* case of liability, however, courts should generally grant leave to amend before dismissing a complaint. See <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002); <u>Shane v. Fauver</u>, 213 F.3d 113, 116–17 (3d Cir. 2000).

## III.    Discussion

Capital posits that Jarman lacks Article III standing to pursue this action, that the court should abstain from exercising jurisdiction pursuant to <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943) or the primary jurisdiction doctrine, and that, at minimum, Jarman's claim for breach of contract is preempted by ERISA and must be dismissed. The court addresses each of these contentions *seriatim.*

### A.    Overview of Act 62 and ERISA

Jarman's claims, and Capital's defenses, are rooted in state and federal statutes, and thus a preliminary  review of both is apt. The Pennsylvania General Assembly passed House Bill 1150, known as the Pennsylvania Autism Insurance Act ("Act 62"), 40 PA. STAT. § 764h, in July of 2008. Act 62, *inter alia*, mandates that private health insurance companies, as well as public health insurance programs, provide coverage for ASD treatments and services. 40 PA. STAT. § 764h(a) ("A health insurance policy or government program covered under this section shall provide to covered individuals or recipients under twenty-one (21) years of age coverage for the diagnostic assessment of [ASD] and for the treatment of [ASD]."). Act 62 applies to the ABA services that Jarman receives. <u>Id.</u> § 764h(f)(1) (including ABA in list of rehabilitative treatments).  The Act applies to private companies and government programs, <u>id.</u> § 764h(a), but includes an annual maximum benefit cap for private

6

insurers, id. § 764h(b). Section 764h(a) initially set an annual limit of $36,000. Id. § 764h(a). This limit is subject to annual adjustments, id., and in 2012, the annual limit was raised to $37,080. See 42 Pa.B. 1018 (Feb. 8, 2012). The current limit is $37,710. See 43 Pa.B. 1157 (Feb. 23, 2013).

Not long after Act 62 was enacted, Congress passed the Mental Health Parity and Addiction Equity Act, codified at Section 712 of ERISA ("Section 712"). See 29 U.S.C. § 1185a. Section 712, in pertinent part, prohibits health plans from imposing financial limitations on mental health treatment benefits if those limitations are not applied with equal force to all medical and surgical benefits covered by the health plan. Id. § 1185a(a)(3)(A) (providing that plans which provide coverage for mental health treatments must ensure that limitations imposed on coverage "are no more restrictive" than those applied to medical and surgical benefits). In February 2010, the Internal Revenue Service, in conjunction with the Employee Benefits Security Administration and the Centers for Medicare and Medicaid Services, issued an interim final rule addressing ERISA preemption under Section 712, providing as follows:

> The preemption provisions of section 731 of ERISA . . . apply so that [Section 712] requirements are not to be 'construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement' of [Section 712]. A state law, for example, that mandates that an issuer offer a minimum dollar amount of mental health or substance use disorder benefits does not prevent the application of [Section 712].

> Nevertheless, an issuer subject to [Section 712] may be required to provide mental health or substance use disorder benefits beyond the State law minimum in order to comply with [Section 712].

75 Federal Register 5418. Jarman contends that Section 712 of ERISA preempts and supersedes the application of Act 62's annual dollar amount limitation to his claims for ABA benefits.

### B.    Article III Standing

Capital's first and strongest contention is that Jarman does not have constitutional standing to assert his claims because he has not suffered any injury. Article III of the United States Constitution limits the jurisdiction of federal district courts to those cases involving "actual cases or controversies," U.S. CONST. art. III, and the constitutional standing requirement derives from this language, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Thus, when plaintiffs assert claims for violation of a federal statute, they must satisfy both statutory and constitutional standing requirements. See AT&T Commc'ns of N.J., Inc., v. Verizon, N.J., Inc., 270 F.3d 162, 170 (3d Cir. 2001) (citing U.S. CONST. art. III; Lujan, 504 U.S. at 560-61); also Leuthner v. Blue Cross & Blue Shield of Ne. Pa., 454 F.3d 120, 125 (3d Cir. 2006) ("To bring a civil action under ERISA, a plaintiff must have constitutional, prudential, and statutory standing."). Capital's argument does not attack Jarman's statutory standing, which is plainly established by Jarman's status as a beneficiary of the Health Plan, 29 U.S.C. § 1132(a) (allowing either "participant or beneficiary" to bring a civil action), but Jarman's ability to establish Article III standing.

8

The Supreme Court has announced that in order to satisfy Article III's standing requirements, a plaintiff must at minimum show that he or she suffered an injury in fact, defined by the <u>Lujan</u> Court as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" <u>Lujan</u>, 504 U.S. at 560 (quoting <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990); <u>Allen v. Wright</u>, 468 U.S. 737, 756 (1984); <u>Warth v. Seldin</u>, 422 U.S. 490, 508 (1975); <u>Sierra Club v. Morton</u>, 405 U.S. 727, 740-41, n.16 (1972)). Capital argues in support of its motion that Jarman's claim is fatally flawed and subject to dismissal because Jarman has not shown that he suffered individual injury as a result of the coverage limitation. The question arises both with respect to Jarman's request for legal damages pursuant to Section 502(a)(1)(B) and his request for equitable relief under Section 502(a)(3). The court addresses each *seriatim*.

### 1.    Standing & Section 502(a)(1)(B) Legal Remedies

According to Capital, Jarman has failed to show that he suffered any injury-in-fact because he has not shown that his denied 2012 claims were not covered by a secondary insurance provider. (Doc. 10 at 6-9). Capital posits that Jarman's claims in excess of its annual Health Plan limit "appear to be covered by [Pennsylvania's] Medical Assistance program," and that Jarman thus suffered no injury as a result of its denial of coverage, citing <u>Wheeler v. Travelers Insurance Co.</u>, 22 F.3d 534 (3d Cir. 1994) in support of its position. (<u>Id.</u>).

In <u>Wheeler</u>, the Third Circuit addressed the implications of secondary coverage on Article III standing in the automobile insurance context. <u>Id.</u> Wheeler,

the named insured under a no-fault automobile insurance policy with Travelers, suffered more than $25,000 in injuries following an automobile accident. Id. at 536. Medicare paid the first $21,947 of Wheeler's medical expenses, and Travelers covered the balance. Id. Wheeler then sued Travelers for the $21,947 paid by Medicare, positing that federal law, specifically the Omnibus Reconciliation Act, 42 U.S.C. § 1395y(b)(1), made Medicare benefits secondary to no-fault insurance, obliging Travelers to pay her first. Id. The court held that Wheeler did not have standing because she suffered no actual or threatened injury and the only real parties in interest were third parties Medicare and Travelers.  Id. at 538 (observing that Wheeler "never . . . had anything to gain from this lawsuit"). Capital suggests that the instant matter is analogous to Wheeler because Jarman has not pled that his claims were unreimbursed by Medicaid or any secondary insurance provider. (Doc. 10 at 6-9).

At this procedural juncture, Wheeler is distinguishable, but not entirely inapposite. In Wheeler, the policyholder plaintiff *conceded* that she suffered no individual injury: she acknowledged that her medical expenses had been paid in full and that she would ultimately be obliged to remit whatever payment she stood to recover from Travelers to Medicare. Id. at 538-39. The court appropriately concluded that absent a concrete and particularized injury-in-fact, the plaintiff had failed to satisfy Article III's constitutional standing requirements. Id. (emphasizing "'the necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Article III requirement'" (quoting Simon v.

10

<u>Eastern Ky. Welfare Rights Org.</u>, 426 U.S. 26,  39 (1976))).  Jarman makes no such concession, despite Capital's efforts to read one into his opposition papers. Rather, Jarman opposes the motion by asserting: first, that Capital's attempt to submit evidence of secondary insurance is, at the Rule 12(b)(6) stage, premature and, second, that even assuming a lack of economic injury, Capital nonetheless deprived him of a right guaranteed by ERISA, which is sufficient to satisfy Article III.

A court is generally limited to considering the pleadings, documents attached thereto, and matters of public record when ruling on a motion pursuant to Rule 12(b)(6). <u>Pension Benefit Guaranty Corp. v.  White Consol. Industries, Inc.</u>,  998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record."). Capital acknowledges this point. (<u>See</u> Doc. 10 at 5 (citing <u>Pension Benefit</u>)). However, Capital's motion attacks not only the merits of Jarman's claims, an argument clearly within the ambit of Rule 12(b)(6), but also raises factual challenges to the court's ability to hear the case in the first instance, a jurisdictional question invoking Rule 12(b)(1). As noted *supra*, such challenges contest the very fact of the court's subject matter jurisdiction, regardless of whether a plaintiff alleged jurisdiction in the complaint, and allow a court to consider "affidavits, documents, and even [conduct] limited evidentiary hearings" in determining whether it has the ability to hear a case. <u>Turicentro, S.A.</u>, 303 F.3d at 300 n.4. Precedent thus permits the court to consider additional evidence before resolving jurisdictional questions.

11

Capital has attached to its motion, *inter alia*, a DPW Autism Insurance Fact Sheet noting that Medical Assistance is available for autism patients "whose costs exceed $36,000 in one year," (Doc. 9, Ex. A), and a Medical Assistance fact sheet circulated by the Pennsylvania Health Law Project which indicates that "loophole" Medical Assistance coverage is available to minor children of high income parents, (id., Ex. B). Capital also submits the Social Security Administration's listing of childhood impairments, (id., Ex. C), to demonstrate that Jarman's diagnosis is covered by Medical Assistance. Capital contends that these exhibits prove that Jarman's claims in excess of the Act 62 annual limit are covered by Medical Assistance and that Jarman has thus not suffered any injury sufficient to satisfy Article III's standing requirements.

The court disagrees with both parties on this issue. Jarman is incorrect that the court may not consider the evidence presented by Capital—it is and has been well-established that in ruling on factual challenges to jurisdiction, district courts are not limited to reviewing the allegations of the pleadings and may in fact review and weigh evidence submitted by the parties. Turicentro, 303 F.3d at 300 n.4. In the same vein, the court is unconvinced that the documentary evidence submitted by Capital unequivocally establishes that Jarman has not suffered an injury: it merely suggests the possibility of, but falls well short of proving, secondary coverage. More pertinently, given the matter's procedural posture, Jarman has not had the opportunity to respond to Capital's factual presentation.

The court is disinclined to make any findings dispositive to its standing

analysis on the limited record presently before it. The court concludes that a

period of limited discovery is warranted to develop a record on the issue of whether

Jarman has suffered an injury-in-fact.[1] Presumably, the information necessary to

confer standing is within Jarman's possession, and thus the court anticipates that a

brief discovery period will be sufficient for Jarman to develop the nature and extent

of any injury that he suffered as a result of Capital's purported violation of ERISA.[2]

Until proof of an individual injury-in-fact has been submitted, Jarman is without

standing to pursue a claim for legal damages pursuant to Section 502(a)(1)(B).

### 2.     Standing & Section 502(a)(3) Equitable Remedies

Jarman's alternative theory, relying upon Section 502(a)(3) of ERISA and

Horvath v. Keystone Health Plan East, 333 F.3d 450 (3d Cir. 2003), fares better.

Jarman argues that his request for an injunction, unlike his request for money

damages under Section 502(a)(1)(B), relieves him of the burden of establishing an

---

[1] The court notes that it is the plaintiff's burden to prove jurisdiction, not the defendant's burden to disprove it, see Renne v. Geary, 501 U.S. 312, 316 (1991), as Jarman implicitly argues. (See Doc. 18 at 3 (suggesting that Capital will have the opportunity to conduct merits discovery to prove or disprove whether plaintiff's claims in excess of the annual limit were covered by Medical Assistance)).

[2] The court approaches subject matter jurisdiction mindful of the Supreme Court's oft-reiterated mandate that district courts must presume they *lack* subject matter jurisdiction unless the contrary appears affirmatively from the record. Renne, 501 U.S. at 316.

individual economic injury. (Doc. 18 at 5).[3] Although, the court agrees that equitable

relief remains available to the plaintiff, it is compelled to clarify the permissible

scope of that relief.

Jarman is correct that Section 502(a)(3) permits health plan participants and

beneficiaries to seek equitable relief, specifically authorizing claims "to enjoin any

act or practice which violates any provision of [ERISA] or the terms of the plan"

and "to obtain other appropriate equitable relief . . . to address such violations or

. . . to enforce any provision of this subchapter or the terms of the plan." 29 U.S.C.

§ 1132(a)(3). However, courts have consistently rejected ERISA plaintiffs' attempts

to disguise *post hoc* compensatory damages requests under Section 502(a)(1)(B) as

requests for injunctive relief under Section 502(a)(3), which often grants a wider

constitutional standing berth. E.g., Great-West Life & Annuity Ins. Co. v. Knudson,

534 U.S. 204, 209-10 (2002) ("For purposes of determining whether a claim for relief

is available under [ERISA], an injunction to compel the payment of money past due

under a contract, or specific performance of a past due monetary obligation, is not

---

[3] Jarman's complaint makes no express reference to Section 502(a)(3) or
relief thereunder. (See Doc. 1 at Count I (claim for violation of Section 502(a)(1)(B)
but no reference to Section 502(a)(3)). Rather, Jarman vaguely requests that the
court declare that the Health Plan violates Section 712 of ERISA, direct Capital to
pay the 2012 Denied Claims, order Capital to amend the Health Plan to eliminate
references to or imposition of Act 62's annual coverage limit, order Capital to pay
Jarman's attorneys' fees and costs, and award "such other equitable or remedial
relief against defendants as this court may deem appropriate." (Doc. 1 at 15-16). A
liberal construction of the complaint permits the inference that Jarman seeks both
legal and equitable damages in conjunction with his ERISA claim and, by logical
implication, that he is proceeding under both Sections 502(a)(1)(B) and 502(a)(3).

typically available in equity."). Thus, to the extent Jarman requests an injunction directing payment of allegedly past-due sums, precedent precludes such a claim.

Nevertheless, Section 502(a)(3) does contemplate forward-looking equitable relief. The Third Circuit has extrapolated upon the Supreme Court's lead in Great-West, holding that although *post hoc* monetary relief is unavailable under Section 502(a)(3), traditional principles of equity permit certain forward-looking financial directives. See, e.g., Unisys Corp. Retiree Med.  Benefits ERISA Litig. v. Unisys Corp., 579 F.3d 220, 236-37 (3d Cir. 2009) ("If an injunction is forward-looking and entitles a beneficiary to an amount of money that cannot be calculated with specificity . . . , the injunction is an equitable remedy that is permissible under ERISA."); see also Pell v. E. I. DuPont De Nemours & Co., 539 F.3d. 292, 307-08 (3d Cir. 2008). ERISA precludes his claims for retrospective relief, but Jarman may nonetheless be entitled to a forward-looking injunction under Section 502(a)(3). See Unisys, 579 F.3d at 236-37; Pell, 539 F.3d at 307-08.

The parties dispute whether a plaintiff seeking solely equitable relief must satisfy the injury requirement of Article III. (See Doc. 17 at 4-5 (Jarman contending that no actual harm must be shown to maintain claim for equitable remedies); Doc. 19 at 8) (Capital positing that injury requirement persists even when plaintiff seeks only injunctive relief )). Jarman argues that the Third Circuit's decision in Horvath v. Keystone Health Plan East, 333 F.3d 450 (3d Cir. 2003), relieves Section 502(a)(3) plaintiffs of the obligation to demonstrate an individual injury-in-fact arising from

violations of ERISA. (Doc. 18 at 4-5). In essence, Jarman contends that the violation itself suffices to establish Article III standing. (Id.).

In Horvath, the plaintiff brought suit against her health plan and alleged that it had violated ERISA by failing to disclose certain financial incentives made to plan physicians. Horvath, 333 F.3d at 456. Horvath sought injunctive relief directing the plan to make the requisite disclosures in the future. Id. The panel concluded that such relief was proper, observing that "'the actual or threatened injury required by [Article III] may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Id. (citing RJG Cab, Inc. v. Hodel, 797 F.2d 111, 118 (3d Cir. 1986); Kirby v. Dept. of Housing & Urban Dev., 675 F.2d 60, 65 (3d Cir. 1982)). Acknowledging that ERISA vested in the plaintiff the rights to receive particular information and that the plan had violated that right, the court concluded that the plaintiff had standing to assert a Section 502(a)(3) claim for injunctive relief.  The Circuit emphasized that a Section 502(a)(3) plaintiff seeking injunctive relief "*need*

*not demonstrate actual harm* in order to have standing" to satisfy Article III.[4] <u>Id.</u>

(emphasis added) (citing <u>Gillis v. Hoechst Celanese Corp.</u>, 4 F.3d 1137, 1148 (3d Cir.

1993)).

The same is true of Jarman's claim for prospective injunctive relief *sub*

*judice*. In his complaint, Jarman asks the court to direct Capital to amend its plan to

comply with, and provide prospective future benefits in conformance with, Section

712 of ERISA. (Doc. 1 at 15-16). Jarman alleges that Section 712 vests in him the

right to a health plan providing mental health benefits at parity with medical and

surgical benefits, 29 U.S.C. § 1185a(a)(3)(A) (mental health limitations may be "no

more restrictive" than medical and surgical coverage), and that Capital violated

that right by imposing an annual dollar limitation on ASD benefits which was not

imposed on any other benefits. (Id. at ¶¶ 44, 46-48).). Jarman has not alleged any

pecuniary harm as a result of Capital's purported violation of Section 712, but he

---

[4] Capital cites to <u>Kendall v. Employees Retirement Plan of Avon Products</u>,
561 F.3d 112 (2d Cir. 2009) for the proposition that claims for injunctive relief still
require a plaintiff to establish "some injury in the form of a deprivation of a right"
and that mere non-compliance with ERISA is insufficient to confer Article III
standing. (Doc. 19 at 8). <u>Kendall</u> is not binding on this court. Moreover, a review of
<u>Kendall</u> reveals that the decision misapprehends <u>Horvath</u>; to be precise, the
<u>Kendall</u> decision reads into <u>Horvath</u> a requirement that a plaintiff "show that they
were generally harmed by the deprivation of a specific right," <u>Kendall</u>, 561 F.3d at
120, a proposition which does not appear in, and is plainly refuted by, the Third
Circuit's language in <u>Horvath</u>. In the court's view, <u>Horvath</u> could not be more clear:
where ERISA has vested a right in a plaintiff, that plaintiff may seek injunctive
relief and *"need not demonstrate actual harm* in order to have standing" to do so.
<u>Horvath</u>, 333 F.3d at 456 (emphasis added). <u>Kendall</u> is directly in conflict with Third
Circuit precedent, and the court declines to follow that decision. Thus, the court
rejects Capital's argument.

has sufficiently established that he suffered a deprivation of a right which, under Horvath, is sufficient to establish Article III standing.[5] For this reason, the court concludes that Jarman has sufficiently established standing with respect to his claim for prospective injunctive relief.

### C.    Burford Abstention and Primary Jurisdiction Deference

Capital also urges the court to abstain from exercising jurisdiction over this case under the abstention doctrine espoused in Burford v. Sun Oil Co., 319 U.S. 315 (1943). The Burford Court admonished that, as a general rule, federal district courts should refrain from exercising jurisdiction when doing so would interrupt a state's efforts to regulate an area "in which state interests predominate" and for which adequate and timely state review of the regulatory scheme is available. Id. at 104 (observing that abstention is "particularly desirable" in such circumstances"); see also Chiro. Am. v. LaVecchia, 180 F.3d 99, 103 (3d Cir. 1999) (summarizing Burford doctrine as requiring abstention "to avoid needless conflict with the administration by a state of its own affairs"). Importantly, Burford abstention is the "extraordinary and narrow exception," not the rule, see Heritage Farms, Inc. v. Solebury Twp., 671 F.2d 743, 746 (3d Cir. 1982), and should be exercised only where the district court is sufficiently satisfied that withholding of jurisdiction is warranted. See Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976).

---

[5] To be clear, this holding is limited to Jarman's Section 502(a)(3) claim for injunctive relief. As noted *supra*, the court will allow the parties to engage in limited discovery on the issue of standing to the extent Jarman desires to persist in his claim for legal damages under Section 502(a)(1)(B).

Burford requires a measured analysis: the court must first consider whether "timely and adequate state law review" is available. If the answer is yes, the court must query whether its "exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." Matusow v. Trans-Cnty. Title Agency, LLC, 545 F.3d 241, 247 (3d Cir. 2008); also LaVecchia, 180 F.3d at 103. The second aspect of the Burford test tasks the court to consider: "whether the particular regulatory scheme involves a matter of substantial public concern, [] whether it is 'the sort of complex, technical regulatory scheme to which the Burford abstention doctrine is usually applied, and [] whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." LaVecchia, 180 F.3d at 105. Capital submits that because Jarman challenges its application of an annual limit imposed by state law, and because that law offers an expedited review process, see 40 P.S. § 764h(k), Burford and its progeny compel abstention. The court disagrees.

Capital's position is singularly focused and, as a result, misapprehends the nature of Jarman's claim. (Doc. 10 at 14-15 (noting that Act 62 creates an internal and external review process and a right of appeal, reflecting important legislative policy considerations)). A plain reading of the complaint reveals that Jarman does not seek application,  interpretation, or implementation of the legislative policies surrounding Act 62, but rather desires a judicial determination with respect to the seemingly inconsistent relationship between Act 62, a state law, and ERISA, a federal statute, as applied to Jarman's claims. (Doc. 1, Count I). Capital entirely

19

ignores the federal and predominant element of Jarman's claims. (See Doc. 10 at 14-15).

The mere fact that a federal plaintiff's claims involve an issue of state law, or the intersection between federal and state law, is not sufficient to trigger Burford abstention. See, e.g., Beye v. Horizon Blue Cross Blue Shield of N.J., 568 F. Supp. 2d 556, 561-64 (D.N.J. Aug. 1, 2008) (noting that to defer an ERISA claim to state court merely because state law provides for judicial review of denials would be "inconsistent with ERISA" because Congress "explicitly intended such claims] to be heard in a federal forum"); DeVito v. Aetna, Inc., 536 F. Supp. 2d 523, 527-29 (D.N.J. Feb. 25, 2008) (same)). Jarman's claim *sub judice* plainly arises under federal legislation and Capital's purported violation thereof. (Doc. 1 at ¶¶ 63-68). Consequently, the court cannot conceive of a claim more appropriately destined for federal court.[6] Hence, the court declines to apply Burford abstention.

Capital's position that the court must defer this issue to the state Department of Insurance ("PDI") suffers the same fate. Citing the primary jurisdiction doctrine announced in United States v. Western Pacific Railroad Co., 352 U.S. 59, 63 (1956), Capital urges the court to stay these proceedings indefinitely, and to defer to PDI

---

[6] Under Capital's theory, any time a plaintiff alleges that a provision of ERISA is inconsistent or in friction with an application of state law, Burford would preclude federal judicial review of that claim, notwithstanding the fact that the very roots of the claim lie in the federal statute. Such an expansive reading of Burford is unsupported by precedent or reason, and is wholly inconsistent with ERISA's stated purpose of providing employer health plan participants and beneficiaries with "ready access to the Federal courts." 29 U.S.C. § 1001.

for a decision as to the impact that Section 712 of ERISA has on Act 62. (Doc. 10 at 17-19). The doctrine of primary jurisdiction, like the various abstention doctrines, is not subject to rigid or formulaic application; it has been loosely described by the Third Circuit as follows:

> Primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

Id. at 64. Capital argues that the PDIC must be given the opportunity to determine the effect of Section 712 on Act 62. (Doc. 10 at 17-19). This argument was rejected in both Beye and DeVito in hand with the defendants' Burford arguments, where both courts concluded that ERISA claims fall squarely within a federal district court's jurisdiction. See Beye, 568 F. Supp. at 561-64; DeVito, 536 F. Supp. 2d at 527-29. Like its Burford argument, Capital's contention that PDI has primary jurisdiction of this issue is based on a fundamental misapprehension of the nature of Jarman's claims, which allege a violation of *federal*—not state—law. Accordingly, the court rejects Capital's primary jurisdiction argument.

### E.    Preemption of Contract Claim

Lastly, Capital argues that regardless of the fate of Jarman's ERISA claim, his common law claim for breach of contract must be dismissed with prejudice. Capital asserts specifically that the relief sought by Jarman in Count II is

duplicative of the relief sought in conjunction with his ERISA claim and that the claim is thus wholly preempted. (Doc. 10 at 19-20). Jarman has not opposed this argument in his opposition papers, and he is deemed to have conceded the point. Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991). Nonetheless, the court is mindful of its independent obligation to evaluate the merits of the moving party's argument. See id. (citing Anchorage Assocs v. V.I. Bd. of Tax Rev., 922 F.2d 168, 174 (3d Cir. 1990)). After a review of the complaint, the court concurs with Capital on this argument. Case law addressing the breadth of ERISA's preemption clause has routinely held that *any* contract claim which challenges the "quantum of benefits due under an ERISA-regulated plan" is "*completely* preempted" by the federal statute. Przybowski v. U.S. Healthcare, 245 F.3d 266, 272, 278 (3d Cir. 2001) (emphasis added). The application of this principle is unassailable in the instant matter. Accordingly, the court concludes that ERISA's preemption clause mandates prejudicial dismissal of Jarman's breach of contract claim.

**IV.** **Conclusion**

For all of the foregoing reasons, the court will grant in part, deny in part, and defer in part Capital's motion (Doc. 18) to dismiss. An appropriate order follows.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:        February 19, 2014